```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

UNITED STATES              :
     Plaintiff,            :
V.                         :          Case No. 3:23-CR-79(RNC)
JOHNNY MILNER              :
     Defendant.            :
```

`                          RULING AND ORDER

Defendant Johnny Milner is charged with three counts of possession with intent to distribute and distribution of 40 grams or more of fentanyl. One count is based on evidence seized from his girlfriend's apartment in New Britain pursuant to a search warrant issued by Magistrate Judge Farrish.[1] The defendant has moved to suppress this evidence and for a hearing to test the veracity of certain statements in the search warrant affidavit under Franks v. Delaware, 438 U.S. 154 (1978). The government opposes the motion to suppress on the ground that, at the very least, the evidence is admissible under the good faith exception to the exclusionary rule. See United States v. Leon, 468 U.S. 897, 913 (1984)(evidence seized by officers reasonably relying on a search warrant is admissible in the prosecution's case in chief). In addition, it contends that a Franks hearing

---

[1] The other counts are supported by evidence of controlled purchases from the defendant - the admissibility of which is not affected by the motion to suppress.

1

is unnecessary because the alleged misstatements are immaterial. I agree with both arguments and therefore deny the motion to suppress without a hearing.[2]

I.

The search of the New Britain apartment was authorized by Judge Farrish based on a 36-page affidavit signed by Michael Caron, an experienced narcotics investigator, who helped direct an FBI Task Force investigation leading to the warrant application. The affidavit sought an arrest warrant for the defendant, as well as a search warrant for a total of five premises, a vehicle and a cell phone, relying on the results of the investigation, which demonstrated that the defendant was a high-level fentanyl trafficker.[3]

TFO Caron's affidavit informed Judge Farrish of the following events that occurred during the investigation. On February 9, 2023, 280 grams of fentanyl were seized by investigators during a search of a residence of a person referred to as CW-1. CW-1, who was present at the time of the

---

[2] The government's opposition addresses the legality of the search of the New Britain apartment and another location. However, the search of the other location is not challenged by the defendant in the motion to suppress so I do not consider it here.

[3] The defendant objects to TFO Caron's use of a master affidavit to support all the requested searches, but the government correctly argues that the objection is without merit. Also unavailing, as the government explains, is the defendant's speculation that Judge Farrish did not have enough time to fulfill his duty to examine the affidavit and decide whether it established probable cause to search the apartment.

2

search, told investigators that CW-1 and another individual referred to as CW-2 had obtained the fentanyl earlier that day from a man they knew as "OG." CW-1 stated that the transaction took place in a vehicle parked outside a liquor store on Hillside Avenue in Hartford.

CW-1 provided investigators with a physical description of "OG." The description matched the defendant. Investigators were familiar with the defendant, who operated the liquor store at the Hillside Avenue location. The DEA had purchased fentanyl from the defendant in the past. In addition, investigators had been told by informants that the defendant was presently supplying fentanyl to dealers operating out of the Sands housing complex in Hartford. Shown a photo of the defendant, CW-1 positively identified him as the person who sold the 280 grams of fentanyl earlier that day.

Investigators examined video footage from security cameras in the vicinity of the liquor store. The video corroborated CW-1's account. It showed CW-1 arriving with CW-2 and entering an Infiniti sedan parked near the liquor store, where the transaction occurred.

Investigators subsequently arranged for CW-1 and CW-2 to engage in two 100-gram purchases of fentanyl from the defendant,

the first on February 21, 2023, the second on March 15, 2023.[4] CW-1 initiated the first purchase by calling the defendant on Facetime. The defendant, whose face is clearly visible in a snapshot of the call, directed CW-1 to meet at the liquor store on Hillside Avenue. Security cameras in the vicinity of the store and an audio/video transmitter worn by CW-2 enabled investigators to observe CW-1 and CW-2 enter the store and meet with the defendant. Investigators then surveilled the defendant as he left the store and drove to another location before returning and reentering the store. The defendant then delivered 100 grams of fentanyl to CW-2 inside the store, which investigators were able to observe via the video transmitter.

The second controlled buy also took place inside the Hillside Avenue liquor store while investigators watched via a video transmitter worn by CW-2. This transaction came about in substantially the same way as the first and again resulted in the defendant's sale of 100 grams of fentanyl. As before, the transaction was monitored by investigators via security cameras as well as the transmitter worn by CW-2. The video camera did not capture the defendant's face as he delivered the fentanyl to CW-2. But it did show his pants and boots, which were the same pants and boots he was seen wearing outside the store that day.

---

[4] These are the transactions that underlie the other two counts of the indictment.

II.

Based on this history, along with much else, TFO Caron's affidavit sought authorization to search the New Britain apartment, which the defendant was using as a residence, and four other locations in the Hartford area that he was using in connection with drug trafficking, including the liquor store. In addition, the warrant sought authorization to search the cell phone he used to arrange the controlled buys and an Acura MDX he drove in connection with the controlled buys.

In support of the request for authorization to search the New Britain apartment, the affidavit provided the following additional information:

(1) The defendant likely was using the apartment to keep records of drug transactions, proceeds of drug trafficking, and drug paraphernalia (such as packaging materials), because drug dealers like the defendant (that is, persons trafficking in the quantities he was selling) commonly use their residences for these purposes.

(2) With regard to drug proceeds, on the day of the second controlled buy, the defendant was seen leaving the New Britain apartment with a black drawstring bag. He then drove the Acura MDX to the liquor store after making a stop at a suspected stash house along the way. Investigators asked CW-2 if he/she had seen the bag during the controlled buy; CW-2 said "no" but added

that the defendant "always" had the bag and CW-2 had seen him place drug proceeds in the bag as well as remove drugs from the bag during prior transactions. In view of CW-2's information, there was reason to believe a search of the apartment likely would yield the black drawstring bag, as well as drug proceeds that had been transported in the bag.

(3) The apartment's location in New Britain, some distance from the other four locations covered by the warrant, increased the likelihood the defendant was using the apartment to store drug proceeds, while using the other locations to store drugs, because drug dealers at the defendant's level do not store drugs and drug proceeds together on a long-term basis.

(4) An early morning search of the apartment, when the defendant was most likely to be present, could be expected to yield the cell phone he used to arrange the controlled buys, particularly because location data for the phone showed that the phone was in the vicinity of the apartment overnight on most nights.

(5) Clothing the defendant was seen wearing in the videos of the controlled buys likely would be found in the apartment since he was apparently using it as a residence.
And

(6) Evidence connecting the defendant to the Acura MDX and Infiniti sedan likely would be found there too for the same reason.

After obtaining Judge Farrish's approval, investigators conducted an early morning search of the apartment. The search yielded 70 grams of fentanyl; $221,301 in cash; a digital scale and money-counting machine; various bags with white residue; the cell phone the defendant used to arrange the controlled buys; and keys to the Acura MDX and Infiniti sedan. These items are the subject of the motion to suppress.

### III.

Under the Fourth Amendment, a warrant to search a residence may not be issued unless a neutral and detached magistrate finds probable cause to believe the search will yield the items described in the warrant. A search is permissible if there is a "fair probability" the specified items will be found. United States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983).

When a warrant has been issued, "great deference" is due to the issuing judge's finding of probable cause. On a motion to suppress, the court's task is "simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing] that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983)(quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

7

The government contends that TFO Caron's affidavit, read as a whole, and construed realistically, provided a substantial basis for Judge Farrish's conclusion that probable cause existed for the search of the New Britain apartment.  I agree.

### A.

Some uncertainty exists regarding the minimum showing that must be made to support a finding of probable cause to search the residence of a suspected drug dealer.  However, there is no requirement of direct observations of drugs, drug records, drug proceeds or drug paraphernalia in the residence.  See generally Wayne R. LaFave, Search & Seizure: A Treatise On The Fourth Amendment, § 3.7(d) and n.207 (6th ed. 2022 Update)(probable cause to search suspected drug dealer's abode can be based on affiant-officer's experience - or magistrate judge's own common sense judgment - that drug dealers ordinarily keep these items in their residences)(collecting cases).

"[T]he Second Circuit has found probable cause to search the homes of suspected drug dealers based substantially on evidence of the dealer's distribution activities outside the home and testimony from the affiant that drug dealers are likely to keep evidence of their crimes in their homes." United States v. Hoey, 15 Cr. 229 (PAE), 2016 WL 270871, at *9 (S.D.N.Y. Jan. 21, 2016) (first citing United States v. Benevento, 836 F.2d 60,

8

70-71 (2d Cir. 1987); then citing United States v. Cruz, 785 F.2d 399, 405-06 (2d Cir. 1986)).

That is the case here. TFO Caron's affidavit provided compelling evidence that the defendant was a high-level fentanyl trafficker whose sales of redistribution quantities of fentanyl were generating large cash proceeds. The proceeds had to be kept somewhere. TFO Caron's opinions concerning the usual behavior of drug dealers like the defendant provided a substantial basis for concluding that he was keeping his drug proceeds in the apartment in New Britain, at a safe remove from the other locations covered by the warrant, where he was keeping drugs. Also connecting the apartment to drug proceeds was CW-2's information concerning the defendant's use of the black drawstring bag, which investigators saw in his possession when he exited the apartment on the day of the second controlled buy.

In addition, and wholly apart from the likelihood that a search of the apartment would yield drug proceeds, the affidavit provided a substantial basis for concluding that a search of the apartment likely would yield admissible evidence of the defendant's involvement in the controlled buys. Specifically, the affidavit established a fair probability that a search would yield the cell phone the defendant used to arrange the controlled buys, the clothing he wore at the time of the

9

controlled buys, and items connecting him to the Acura MDX, which had recently been parked at the apartment.

### B.

Under existing case law, therefore, additional evidence of a nexus between the apartment and the items listed in the warrant was unnecessary for a finding of probable cause. However, even if some additional evidence were arguably necessary in view of the Fourth Amendment's solicitude for the sanctity of the home, the good faith exception applies.

In United States v. Kortright, No. 10 CR 937 (KMW), 2011 WL 4406352, at *9 (Sept. 13, 2011), where there was no evidence to connect the defendant's illegal drug activity with his apartment except the opinion of an agent/affiant, the court deemed the agent/affiant's opinion insufficient to support a finding of probable cause.  Because of uncertainty concerning the need for more evidence to support a finding of probable cause, however, the court concluded that the good faith exception applied.  See also United States v. Williams, 350 F.Supp.3d 261, 275 (W.D.N.Y. 2018)(even assuming additional evidence were required to support search warrant for drug suspect's residence beyond observation of him leaving residence and proceeding directly to controlled purchase, good faith exception applied).

10

For the reasons discussed above, TFO Caro's 37-page affidavit provided considerably more support for a finding of probable cause than the agent's opinion in Kortright.

IV.

The defendant contends that he is entitled to a Franks hearing because the affidavit contains the following "significant falsehoods":

- The affidavit states that the defendant was known to store drug proceeds in the black drawstring bag when in fact CW-2, the only source for this statement, was an unreliable informant with no record of truthfulness who was working for financial compensation.

- The affidavit states that the defendant lived in the New Britain apartment when in fact he merely spent most nights there.

- The affidavit states that the defendant owned the Acura MDX when a simple check of motor vehicle records would have revealed that he did not.

And

- The affidavit states that a video of the second controlled buy corroborates CW-2's statement that he got the drugs from the defendant when in fact the video shows only the pants and boots of the individual who transferred the drugs.

11

The government contends that these alleged misstatements, considered singly and in combination, do not warrant a Franks hearing. I agree.

The statement that the defendant was known to store drug proceeds in the bag was expressly based on CW-2's information, the reliability of which Judge Farrish was able to independently assess. Defendant's argument that CW-2's information was plainly unreliable is incorrect. The 280-gram transaction and the subsequent 100-gram controlled buys provided sufficient reason to credit CW-2's description of prior transactions with the defendant involving the black drawstring bag.

The statement that the defendant lived at the New Britain apartment was true. It is undisputed that he spent most nights there, as shown by his cell phone location data. In support of the present motion, his girlfriend has attested that the defendant frequently stayed with her and their minor child. That the defendant might have used another residence from time to time is of no consequence.

From all outward appearances, the Acura MDX was the defendant's vehicle. He used it to facilitate his drug business and parked it at the New Britain apartment, as confirmed by direct observation and license plate location data. If Judge Farrish had known that the vehicle's title was in someone else's name, it would have made no difference.

The video of the second controlled buy depicts an individual wearing the same pants and boots investigators saw the defendant wearing outside the liquor store that day and thus strongly corroborates CW-2's statement that it was the defendant who delivered the drugs.

V.

Accordingly, the motion to suppress is hereby denied without a Franks hearing.

So ordered this 21st day of February 2024.

/s/RNC

Robert N. Chatigny
United States District Judge